On behalf of the appellant Michelle Appelbaum and Jason Ades, on behalf of William Diapoli and Christopher Walton. Mr. Ades or Ades? Ades. Ades. You may proceed. Good morning, Your Honor. To please the court, we respectfully submit that the trial court in this matter erred in setting Michelle Appelbaum's maintenance award. In light of this 20-year marriage that resulted in Mrs. Appelbaum receiving 45% of her stated expenses, which was inconsistent with the lifestyle that was enjoyed by the parties during that marriage, and where Mr. Appelbaum was left with his lifestyle unabated. Specifically, there was error committed in connection with the imputation of income to Mrs. Appelbaum. The trial court imputed $20,000 of annual income to Mrs. Appelbaum, which we submit was arbitrary. First, let me break that down just as a threshold matter. Are there two issues here? Is there an issue whether the court erred in finding that Mrs. Appelbaum was capable of working and could have some income? And then the second part of that is whether the $20,000 figure was improper. Yes, I think that that breaks it down fairly. That the conclusion that she's capable of working was contrary to the evidence presented. And then the $20,000 figure was not based upon any specific evidence at all. There was no evidence of a particular job that she was qualified to fill. She's educated with a college degree. She is. She works out. She does. There's no mental impairment. There's no mental impairment. I think the physical impairment is what was the disconnect. And both Dr. Grover, the rheumatologist, and Michelle, and Michelle's testimony was found by the trial court to be credible, that stress exacerbates her lupus condition. So one of the reasons why the decision to find that she was employable at a rate of $20,000 a year is arbitrary is because we don't know if she did find a job, whether or not the stress involved with that job would exacerbate the lupus. Although the doctor said that it would. Michelle says that whenever she feels stressed, it has a tendency to increase her symptoms. And we look at the Grunston case, which is one of the cases that we cited that reversed a maintenance award for being inadequate to approximate the lifestyle during the marriage. One of the reasons for the reversal there was the wife in that case suffered from depression, and there was medical evidence that going back into her chosen profession, which was modeling, would have caused her to exacerbate her condition. So there's similarities in those cases, and I believe it's a basis here to find error as well. Counselor, while we're on that point, and this is to try and build on the point, I think clearly the evidence established that Mrs. Applebaum has a condition that would affect her ability to earn a future income. But did the evidence actually establish that she is disabled and cannot return to work at all? Was that the testimony? That was not the testimony. I think that there are two pieces of the testimony that when you put together mandate that conclusion. There was the testimony of the rheumatologist. What's the standard of review when you say that mandates that conclusion? Well, it's manifest way to the evidence, and the question is whether or not it was arbitrary or not. And I submit to Your Honor that it is arbitrary. And the reason being, and where I believe the trial court failed to connect the evidence appropriately, was that the medical testimony was that she could return to work, that she was capable of working. Mrs. Applebaum's unrebutted testimony that the trial court found to be credible was that she doesn't contact a rheumatologist each time she has a flare-up. She's been living with the disease for almost 20 years. She knows how to adjust her prednisone and other medications when need be and get into bed when she has to. And that every day, as a preventive measure, because of the exhaustion she feels and the pain that she suffers, she gets into bed when her daughter goes to school. And when you tie those two pieces of evidence together, the question is what kind of a job for $20,000 is going to give the latitude of the employee to take large amounts of time off. She testified that she has three major flare-ups a year that could be as long as a week at a time to recover from, and then intermittent flare-ups that take less time to recover from, but they happen unpredictably. And when you put those two pieces of evidence together, I do believe that the result is arbitrary. Where did the $20,000 come from? There wasn't a particular job identified, a particular number of hours that she would be expected to work, a certain task that she'd be able to fulfill without suffering the kind of stress that could exacerbate her condition. And I think that in light of the lack of evidence to tie the imputed income to this particular person's condition, years out of the workforce and the ailments that she suffers from today, results in arbitrary conclusions. Bottom line, is it unreasonable and arbitrary for the court to do that? I mean, what I'm hearing you saying is, look, she's testified, and it could very well be, that there'll be flare-ups, exacerbations, and she's going to have a problem working. But we don't know that either, based on the evidence, because the doctors are saying that, you know, she is capable of working. She's not totally disabled. So you say, but ah-ha, this might happen, ergo, we should attribute no income to her, she can never work at all, because something might happen. A lot of things could happen. It doesn't mean you're going to. So I'm trying to separate your argument that the court made an unreasonable and arbitrary decision, not based on the evidence, because of something that could possibly happen in the future. Well, respectfully, I think that the opposite view of the evidence is equally as speculative. And that is, we don't know what's going to happen if she – first of all, we don't know what job it is that she's supposed to go and return to. And the rheumatologist didn't know either, without a crystal ball, what would happen if she returned. So what I'm suggesting is that, in light of the body of case law in this area, we have a reviewable maintenance situation. Let me ask you about that issue concerning maintenance. How can you argue that the trial court erred in not awarding Michelle a higher percentage of her stated needs when the trial court specifically found that her expenses were exorbitant and unsustainable? Your Honor, the answer to that question is as follows. There was an evidentiary hearing at the temporary support level. Which you cited in the brief. Correct. Later, the court said – he specifically said, don't rely on those findings, because he found some of her representations to be not credible. Absolutely correct. You didn't say that in your brief. Well, I think that we – I don't have the – I mean, I could go through the briefs. I think that we did acknowledge, and I certainly don't suggest to Your Honor that that finding wasn't made. So when you refer to that hearing, let's focus on what was credible. And this is what I'd like to suggest to Your Honor with regard to the temporary support hearing. There was an evidentiary hearing, and you're right that the trial court specifically stated that he did not wish to put too much weight on it because, in his view, it was prior to discovery being conducted so that it was early on in the proceedings. Let's not give it too much weight. So what happened thereafter? We went to trial over what the right amount of support should be, what the expenses should be for Michelle Applebaum. The evidence that was presented to refute the dollars that she suggested was 2009 financial data. 2009, the divorce was already pending. It was not representative of the lifestyle of the parties during their marriage. So the – what I believe the trial court did was relied on financial evidence that was after the status quo had already changed, because now we have a divorce case pending, there's less money being provided to her in support, and it was not, in fact, consistent with the lifestyle that they enjoyed. Moreover, Michelle testified at trial that the numbers that she was asking for in connection with the maintenance was less than what they actually spent during the marriage. And I also point out that – I just lost my thought on that point. I'll come back to it. I'll come back to it. But – oh, I know exactly what I was going to say. The trial court made specific findings with regard to what the lifestyle was. That's what I wanted to tell you. And the lifestyle consisted of their home in Highland Park that was worth $800,000, their Elkhorn Ranch, the Silverstone Ranch, 180 acres, with this opulent seven-bedroom home with the indoor pool and the home theater, the vacations to the Caribbean, the clothing, the grooming, the personal trainer, the gym. These are the findings that the trial court made. So on the one hand, the trial court said that he felt that some of the requests that were made from Michelle on the end analysis were exorbitant. I don't believe that can be squared at all with his own findings as to what the lifestyle consisted of and that the Worldwide Shrimp Corporation is going to continue to provide Mr. Applebaum with what the trial court quoted as being a borderline lavish lifestyle going forward. And of paramount importance, what is Mr. Applebaum's lifestyle going to look like going forward relative to Mrs. Applebaum's lifestyle? Can you comment on that? Because that is one of the things. Why is his lifestyle going to be better? Is it going to be improved over the lifestyle in the marriage? Hers is not, but arguably both parties are going to – their standard of living is going to change for the worse, so to speak? Well, according to case law, that's something that should be anticipated and it's something that should be proportionately experienced by the parties. And I submit to you that that's not at all the case here. When the evidence concludes in this matter, Mr. Applebaum is still maintaining two homes with this 880-acre ranch. With a substantial debt. Michelle got the house without debt, pretty clear, correct? She did, but the argument that debt now exists does a couple of things. Number one, during the course of the case, that debt was incurred in part because of the amount that he was spending. And he was found not to have been credible. He misrepresented to the court what his expenses actually were. So Mrs. Applebaum was subsidizing the conclusion that, well, she should get less maintenance because he has so much debt. And when you look at the Nord case, the Nord case had a conclusion where the husband had a negative monthly cash flow. But because of the lifestyle that was enjoyed during the marriage and the dim prospects of the wife in that case, being able to approximate the lifestyle enjoyed during the marriage, the maintenance award in that case was $17,000 was a phone. So the fact that he is carrying debt is offset, I think, by his own conduct during the course of the case. But then also by the fact that he has been When you say his own conduct, what do you mean? Well, what I mean is that the court made very specific findings that, in part, the fees in the case were driven by Mr. Applebaum appearing repeatedly before the court saying, I'm in desperate financial condition and I'm trying desperately to downsize my expenses. And the trial court found that he blatantly misrepresented that that was, in fact, the case. Just one example that sticks out is in the middle of the case, he's at Charlie Trotter's in downtown Chicago spending $2,500 on a single meal, which hardly squares with the vision of a man who is undergoing this incredible decrease in fortunes and needs relief. Well, with regard to that, the trial court actually increased his average income based on general trends. Well, that was one of the, you're keying on one of the points that we believe the court erred on as well. And that is the court making the finding that he was unable to ascertain with uncertainty what Mr. Applebaum's income was and that the tax returns only reflected general trends. He did not then provide us with the calculation as to how he reached the $550,000 to $600,000 range other than to comment that he accepted some of the testimony that he heard regarding the nonrecurring income. And it's my position that whether or not you accept his income between $550,000 or $600,000 or whether you accept the average income over the five years that was presented at trial of $728,000, that the maintenance payment is unacceptably low in either case. It was within the evidence, though, wasn't it? What was within the evidence? The court's determination of what the income was. You said that he didn't give a rationale or support it with some sort of assessment or determination, but it was within the parameters that the parties claimed, was it not? It wasn't lower than what he claimed, and it wasn't higher than what she claimed. Well, it was higher than what he claimed. Yeah, but I said it wasn't lower than what he claimed, which meant that you have the parties, and they're arguing about this much, and he isn't down here and he isn't up here. He's somewhere in between. I accept that as being accurate. I'm not sure that that means that it doesn't constitute reversible error because it was, in my view, arbitrary. Well, normally when it's outside the evidence, it's fairly obvious that it's error at my point. So the error may not be as obvious here, but I believe that the error nonetheless still exists, and the reason for it is that I believe there were three distinct stages of income that were looked at between 2005 and 2009. In 2005, the Worldwide Shrimp Company was in its startup mode, and the parties lived off of some retirement income during that year. In 2006 and 2007, the income was higher. Worldwide Shrimp was clicking along, so to speak. And in 2008 and 2009, the recession was in full blossom. It's my view that by discounting the non-recurring income, so to speak, we don't know exactly what non-recurring income he discounted, it put too much emphasis on the recession years, and what really should have been done was to take a true average of his actual income during that five-year period. Counsel, time is up, and you've talked mostly about the maintenance-related issues, but you also raised the issue you felt the court erred in not requiring Mr. Applebaum to pay all of Mrs. Applebaum's attorney's fees. Yes. Because I did a calculation, I think the court required him to pay about 82% of her attorney's fees. So why is that an arbitrary, why is that an abuse of discretion, and no reasonable person would have agreed with that decision? Primarily because of the conduct of Mr. Applebaum during the course of the case that drove up the fees in this case. But he still paid 82%. It's true. But when there are expressed findings of a lack of credibility, of intentional misrepresentation to the court, of increase in fees, I believe it would have been appropriate for Mrs. Applebaum to be responsible for none of her fees, and I believe it's an abuse of discretion because it will undermine her financial stability. Because of the budget deficit that she's been left with in relation to her actual expenses and the maintenance she was awarded, the liquidity that she will receive, the $350,000 she will require in order to make up that budget deficit, the money will be gone. And she'll be forced to sell her home that she lives in with her daughter Samantha, and that is contrary to case law. The attorneys' fees and on maintenance that say that where there's money available, that the recipient should not be put in a position to impair their capital in order to meet their needs. Do you have any cases that say the court should not or should factor in nonrecurring income in calculating net income? I don't have any cases in either direction, to be honest with you. And I noted that, and I don't believe the counsel cited any either, and that's part of the problem that I had with the methodology. There really wasn't a methodology that was explained. And the only thing that I thought was instructive of this court is Rogers that says in the setting of the child support case that you consider all income, and you first determine what the income is, and if you're going to then deviate from it. Based on statute? Based on statute, I know that it's not an exactly analogous argument, but I think that it's the one that makes the most sense. And if a court is going to set someone's income for purposes of support less than what actually appears on their tax returns in the evidence that's presented, there needs to be an explanation for the litigants and for the review in court to be able to ascertain the propriety of that calculation, and that didn't take place here. That's what I believe makes it arbitrary. Thank you. I appreciate your big rebuttal. Thank you. Mr. White. Just to pick up where Justice Burkett left off, Rogers said, and again they are applying the directive of Section 505 that says if we're going to calculate net income under Section 505, we look at all income from all sources, whether it's recurring or non-recurring. But Rogers also says that you can then make adjustments, you can deviate from the guidelines to take into account the fact that the income is non-recurring and may not come to the payor in the future. So to the extent that it is analogous and to the extent that Section 504, the maintenance statute, directs that the court consider Mr. Applebaum's present and future earning capacity, if you're going to look at his future earning capacity, by definition, non-recurring income is income that he's not going to have in the future. So it ought to be excluded under the plain directive of the statute. And the fact of the matter is in the Applebaum case, what makes it a remarkable case is that from the time that he lost his job at his family owned company back in 2001, these people essentially lived off of asset sales, liquidations of his pension through his prior employer, liquidation of his stock through his prior employer, all, by the way, not the pension, but certainly the stock, non-verbal money. And that is how they lived until he got his other business, World Wide Shrimp, going. Now to jump back to the questions about her income, the finding that she was impaired but not incapable of working is clearly subject to the manifest weight standard of review. And there was clearly evidence to support Judge Strickland's decision that she was capable of working. The question was put to her internist, Dr. Breeder, who had been her internist for I think something like five years, is there anything that would prevent her from working? Answer, no. And her rheumatologist said essentially the same thing. What are the limitations on her imposed by her lupus undifferentiated connective tissue disorder condition? A, stay out of the sun. B, get a good night's sleep. All right. So you're not contesting the fact that she has a medical condition, but you're saying the testimony that's delineated by the doctors would say, look, it's not such that she's not capable of working. Correct. All right. To which opposing counsel says, ah-ha, even if that's true, is it also true that if she has a flare-up or an exacerbation of this condition, she's going to be in bed rest? How is she going to work when that happens? Well, note that neither of her doctors thought that the potential for a flare-up disqualified her from working. But even assuming that one were to discount the doctor's testimony, which I don't believe as a reviewing court this court should do, but even if one were to do so, Michelle Avalon's testimony was on average I think three flare-ups a year. That's at page 394 of the transcript of her testimony. Lasting, you know, maybe up to a week, but, yes, she can control it with medication. Does that prevent you from holding full-time employment? Let me ask you a question. Do you have any cases that say where an actual salary amount was imputed to a spouse who hasn't worked in 20 years? I think in the Nord case, pretty sure it was the Nord case, which was affirming, I mean, as the word was, a reversal, they imputed $13,000 a year to a high school graduate. Here you've got, of course, $20,000 a year to a college graduate with a master's, who admittedly has been out of the workforce for a long time. But understand the position that the trial judge was faced with here. You had Michelle Avalon, who took the extreme position throughout the trial that she was totally incapable of working, income potential zero, contradicted, rebutted by her own doctors. And that's the case that she chose to present to the judge. Didn't give it, you know, many cases you'll have the maintenance recipient will get up there and say, well, you know, I've searched for employment. I've tried to get a job. I can't get a job. The only job I can get is making minimum wage at Ann Taylor, blah, blah, blah, blah, blah. She didn't put on any of that kind of evidence. And she essentially, and you have a judge who is required by the statute directed to consider her earning potential, her earning capacity. So it's certainly not air for him to pick some number. Now, her position is, well, it was Mr. Applebaum's burden of proof to establish what her income potential was. And I disagree with that statement. I don't think that the law assigns a burden of proof. And if it is going to assign a burden of proof, it ought to be on the person who is seeking the maintenance. That's number one. Number two. Well, isn't the husband supposed to be establishing a negative fact, because she doesn't need any income? Well, I don't think Mr. Applebaum's position ever was that she shouldn't be getting any maintenance. He always agreed she was a maintenance candidate. It was an industry reserved for trial. But what I would say, I mean, as a practical matter, if the court were to assign to the maintenance payor the burden of proving what she could earn, in a case such as this one where the maintenance recipient has been out of the workforce for a lengthy period of time, the only way that that could happen is you would essentially be establishing almost a per se rule that the payor has got to go hire a vocational expert. My point is, counsel, the burden of going forward is usually on the person who is making the claim. I see. The claim that she can work. The claim that she's entitled to $20,000 or $30,000 or $50,000 or $100,000 a month. She is making a claim on him for a certain amount of money per month. The burden of going forward is usually on the proponent of the claim. I suppose it depends on how you define the claim. If he's suggesting that she's moving for maintenance, it's her burden. Correct. And if she's going to say that she can't work, that, too, is her burden. Right. You got into a defensive state of mind here, in terms of you being put in a position that you're not in. Yeah. But let me ask you this. Were there any potential jobs identified, discussed, or bantered around in the trial court record that she could get after not working for 20 years? Did any of that ever come out? In the record, as opposed to in pretrials, I don't think so. Other than a return to, you know, obviously her master's was in some kind of social work or therapy, something in that field. Now she doesn't have licensing. She'd have to reapply for licensing and so forth. So, obviously, that was an issue. But bear in mind, we don't have Judge Strickland here imputing $100,000 a year to her or $50,000 a year. I think in the Nord case they said minimum wage was $13,000, and here it's $20,000. And I think even if, and I don't think that is the heart of this case or the heart of this appeal, because I think the award of $9,000 a month in maintenance plus the $2,700 a month in child support is defensible even if you don't assume any income to her. They do an analysis in their brief citing some, including some tax calculations using a software program that, by the way, are not part of the record of appeal. But even if Your Honor were to consider them, they have her net income on an after-tax basis at over $9,000 a month, and they have her basic expenses at about the same. But her so-called basic expenses include things that are far from basic. They include things like the children's camp, which Mr. Applebaum is required to pay for in the Judgment for Dissolution of Marriage, so they're not expensive for her. They've got a personal trainer for her at two times a week, something she started four years before the trial, so really in the late stages of the marriage, who turns out to be a Pilates instructor, not prescribed by any of her doctors. She can cut that back. She's got another therapy at once a week, again, started at the end of the marriage, as she said in the last three years of the marriage. She's got that at one time a week, and she admits that it's partially covered by insurance, but she doesn't take any deduction for the cost of insurance. And if you start chipping away at some of those so-called basic expenses that aren't basic expenses, you arrive at a surplus that she has to meet her expenses. What about the argument that Mr. Applebaum was awarded income-producing property when she was inactive? Is that something that has to be taken into consideration? Of course it's something that has to be taken into consideration, and it's something that was taken into consideration by the trial judge in setting the maintenance award. He got all the debt, and he got the business that generates the income to maintain the debt and to service the debt. And that's what happened. And, you know, we spend our briefs focusing on the Michelle side of the equation, but under their own analysis, with Mr. Applebaum's income of $550,000 a year, he's got essentially $21,000 to pay the $2 million in the line of credit, which was a variable interest, interest-only variable rate line of credit on the ranch, to pay all the expenses of this family, which are on his financial affidavit, at $15,600 a month. To not only that, he's of course got, which are not part of the record, the expenses of his new family, his fiancee and their children. Plus, he's got to pay out of that money because he's got no liquid assets as part of this divorce. He just got the business. He just got a source of income. No liquid assets. He has to come up with a balance of her $350,000 property award. He's got to come up with $30,000 as a share of undistributed income from the business for 2009 for Michelle Applebaum. He's got to come up with 100 Gs and $100,000 in attorney's fees to pay to her lawyers. He's got to pay his own lawyers. He took $30,000 or $40,000 in credit card debt as part of the divorce. He has a lot of obligations that the judge was requiring him to pay. And then when we say $21,000 a month based upon their analysis, not part of the record on appeal, that's based on imputed income of $550,000 a year, when in fact the only evidence of record was that in the two years immediately preceding the divorce, 2009 and 2008, his income was about $360,000. And on $360,000, it becomes almost impossible. And the case law directs, Weary's and Charles and others, in a situation like this, it doesn't become just a lifestyle analysis. If there is a deficit, the trial judge is supposed to apportion the deficit between the parties. And Mr. Applebaum, contrary to what you heard from counsel, has adjusted his lifestyle. In the record on appeal, right at the end of the trial, you have in evidence the closing statement he had to sell his house. He sold his house in Highland Park. He had $750,000 in debt on that house. The net he got out of the sale was, I think, on the closing statement at about $89,000. And he sold that house because he was servicing, at that point, $2,750,000 in debt. And he incurred the debt on that house to pay off the debt on her house, which he got fully included. I think he's in line. How much equity does he have in that house? You mean the ranch? Well, I don't know that the trial judge gave a specific finding as to the fair market value. I think he gave us a range, but I think it was around $3 million as the fair market value, with $2 million as the debt. So he's got a million in equity there. Mr. Applebaum was given a home worth of about $875,000 in extra income. Correct. Correct. Can we comment on the attorney's fee argument? Sure. On the attorney's fee argument, their total fees in the case were the $145,000 that Mr. Applebaum paid during the case, which Judge Strickland said came for the vast majority, which didn't come out of joint funds. It came out of Mr. Applebaum's separate funds. Plus the $150,000 found reasonable by the judge as part of the contribution hearing. And I think your calculations were right on. He paid about 82% of those fees, leaving 18% for her. Now, you know, if you accept the proposition that Mr. Applebaum is cash flow constrained and is going to barely be able to meet his needs and his obligations to Mrs. Applebaum out of the share of his income that has been allotted to him, well then, if he were to pay all of her fees, he would be paying out of assets the same way that she is paying out of assets.  Could no reasonable person think that it's unfair to make one of the litigants of the divorce case pay 18% of her fees? I don't see how that finding can be made. And certainly no case has been cited by anyone for the proposition that it is an abuse of discretion, which is the most deferential standard of review, to require one litigant of the divorce case to pay 18% of the fees, whereas the other litigant, of course, let's not forget, he paid all of his own fees. So if you looked at the total fees of the case, it wouldn't be 82% that he paid, it would be much higher. Why shouldn't we, to go back to the non-recurring income, why shouldn't we factor in, or the court, trial court, not factor in non-recurring income in setting maintenance when courts are directed to do so with regard to child support? Well, I don't know that I agree with the statement that they are directed to do so for child support. They're directed to do so to do a Section 505 guideline support calculation, but they're not bound to impose the guideline support calculation. They're permitted to deviate down. That's a very disconsiderate question. Exactly. So what I would say to you is because the directive under Section 504 is to look at earning capacity, by definition, a non-recurring source of income, one that's not going to reoccur in the future, is not indicative of the payor's earning capacity. As a practical matter, if you look at what Mr. Applebaum has available to him to pay support, you want to look at a non-recurring source of income, all that it could be would be gifts from family members, which he hasn't gotten in years and years, or the sale of his property. And, you know, the rule normally is that neither party is required to evade their assets for purposes of support. So here, that may actually, in fact, happen for both of them, but not for one more so than the other. So for all of those reasons, I think Judge Strickland was faced with a tough case here, and he had to do some apportionment between the parties. He did assign burdens to both sides. And I don't think that one can conclude that it was so skewed in favor of Mr. Applebaum and so skewed against Ms. Applebaum that abusive discretion occurred. And everything else that they're arguing about is manifest way. All the judge's findings to support his award are manifest way questions, and there is ample evidence to support the trial judge's award. And let me just make one last point. Counsel cited to the Nord case, a case where $17,000 a month was affirmed, where the husband had negative cash flow. And if you look at the facts of that case, the finding there was that the payor there had purposefully made himself cash flow constrained by putting all of his debt under a four-year amortization schedule. And that's exactly the opposite of what Mr. Applebaum has done. Mr. Applebaum has an interest-only loan for $2 million that's at a variable interest rate. He paid off, during the case, $750,000 of debt by selling the house that he lived in. So Nord is not in this case at all. Thank you. Thank you. Mr. Adas. Thank you. Picking up where Mr. White left off, the Nord case actually is very much similar to this case. And in fact, the trial court found that during the course of the litigation, Mr. Applebaum met all of his expenses. He paid everything that he wanted to. And so the fact that this $2 million of debt accrued during the course of the marriage was a result of his spending. He chose to spend that way. It wasn't to support Mrs. Applebaum. There was findings that he had understated his Silverstone Ranch expenses to the court, that he had not presented evidence about the amount that he was spending to support the party's former nanny and the child they had together. And then he turns around at trial and says, well, I have this debt to service, and that should then result in an impairment in the lifestyle of Mrs. Applebaum post-divorce. I think it's actually very similar to the Nord situation, where you make your bed and you lie in it. And I find it very interesting that Mr. White argues to you that there's areas that Mrs. Applebaum should cut back. Well, she doesn't need to have a personal trainer, notwithstanding the fact that that was something that the court found to be part of her lifestyle. And where was the evidence of Mr. Applebaum cutting back his lifestyle? The fact that he sold his house at the last moments of trial is indicative of nothing. He also testified that he was going to rent a home in Highland Park to keep his son in school there, the party's son in school there. So as a result, the only thing that the court could conclude was that there would no longer be a mortgage payment, but there would be rent. And no basis to conclude that his overall expenses would have been reduced $1. That's something that's missing. And on the cases, and particularly modification cases, when someone comes in and argues a diminution in their income, and in many respects this is very much like a modification case, because Mr. Applebaum argued at trial that his income had reduced while the trial was going on, and therefore there should be an adjustment to the maintenance post decree. One of the things that the court looks at is whether or not the person, crime poor in essence, has taken any action at all to change their lifestyle, to absorb some of the alleged change in their circumstances. Did not the trial court find that both parties were living beyond their means? That may be so, Your Honor, and I think that's an exact quote from one of the findings, but I submit to you that the result was not an equitable apportionment of the reduction in lifestyle between the two. Michelle Applebaum's left with an $8,000 a month budget deficit. Mr. Applebaum is continuing to maintain all of the bells and whistles. I mean, when we're talking about this Silverstone Ranch home, where's the evidence of him selling the farm equipment, selling the horses, selling the home theater equipment? None of that happened here. So what the picture is left with at the close of evidence is a man who is suggesting that he can't maintain the expenses of the family and his wife of 20 years, but is doing nothing to change his own personal condition. Isn't that what living beyond your means is, is that you don't sell the horses when you should and you don't sell the cattle when you should because you're living beyond your means and you're cash-starved? It is. So is this a diagnosis or is this a remedy, a treatment? If it's a remedy and if it's a treatment, I submit that it's still inequitable because it leaves Mr. Applebaum with somewhere between $23,000 and $30,000 a month in comparison to the under $10,000 a month that Mrs. Applebaum has to pay all of her expenses that will result in her having to sell her home that she lives in with her daughter while there's no reason to believe that Mr. Applebaum will be doing anything other than continuing on with the 180-acre ranch and the Highland Park home and the money to pay for his new family. Why does she have to sell her home rather than reduce some of her expenses that the Trump court found that were exorbitant and unnecessary and not sustainable? The answer is that even if she reduced some of her expenses, there's going to be a significant budget shortfall and the liquidity that she received, if the judgment stands for her to pay her returns fees and leaves her with a budget deficit, there will be a life in which that liquidity will be gone and then she will have no choice but to sell the home. The amount of the budget deficit determines how long that will take. At current rate, it will be about four years. Current rate is what? About $8,000 a month between the lifestyle expenses and the net maintenance and child support, mind you, because the child support is going to fall away as well and that's something that should be taken into consideration. Thank you. We'll take the case under advisement. It will be a short recess. Thank you very much.